**KENT S. ROBINSON**
Acting United States Attorney
District of Oregon
**ALLAN M. GARTEN, OSB #812360**
Assistant United States Attorney
allan.garten@usdoj.gov
**MICHELLE KERIN, OSB #965278**
Special Assistant United States Attorney
michelle.kerin@usdoj.gov
1000 S.W. Third Ave., Suite 600
Portland, OR  97204-2902
Telephone:  (503) 727-1000

      Attorneys for the United States of America

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CR 07-535-BR** |
| **v.** | **GOVERNMENT'S TRIAL BRIEF** |
| **JOSEPH OQUENDO SALADINO, ET AL.** | |
| **Defendant.** | |

      The United States of America, by and through Kent S. Robinson, Acting United States Attorney for the District of Oregon, Allan Garten, Assistant United States Attorney and Michelle Holman Kerin, Special Assistant United States Attorney, submits the following trial memorandum for the court's consideration in this case.

I.      **STATUS OF THE CASE**

On December 20, 2007, the grand jury returned an indictment charging defendants with one count of conspiracy to defraud the United States in violation of 18 U.S.C. §371.  Trial is currently scheduled to begin on November 3, 2009.  The government anticipates requiring ten (10) business days to present its case in chief.

II.     **STIPULATIONS**

At present, there are no stipulations between the parties.

III.    **CUSTODIAL STATUS**

The defendants are not in custody.

IV.     **EXHIBITS AND WITNESSES**

The Government intends to call 34 witnesses and introduce approximately 300 exhibits in its case in chief.  The Government has filed a separate Exhibit List but will consult with defense counsel prior to trial to pre-admit its exhibits.  The Government has filed a separate Witness List identifying its witnesses.

V.      **JUDICIAL NOTICE**

The court has taken judicial notice of the following: the Internal Revenue Service ("IRS") is an agency of the United States.  *See,* Opinion and Order, April 9, 2009, Docket No. 156.  The United States has proposed Ninth Circuit Model Jury Instruction 2.5 in this regard.

VI.     **STATEMENT OF FACTS**

The defendants conspired from 2002 through at least 2005, to defraud the United States by deceitful and dishonest means, by impeding, impairing, obstructing, and defeating the lawful government functions of the IRS, an agency of the United States, in the ascertainment,

computation, assessment and collection of revenue, federal individual income taxes.  The facts as follows:

The Freedom & Privacy Committee ("FPC"), was created by Defendant Joseph Saladino ("Saladino") in January 2000.  FPC has marketed and sold numerous abusive tax products throughout the United States which have no legitimate purpose and were designed with the intent to assist people evade federal income taxes.  In May 2002, defendant Michael Mungovan a.k.a "Cajun Mike," ("Mungovan") became the National Sales Director for all products sold through FPC and continued in that capacity through at least November 2005.  Beginning in 2001, defendant Marcel Bendshadler ("Bendshadler") marketed and sold FPC's products to individuals, the majority of which resided in the state of Oregon and he eventually became an FPC Independent Representative.  In addition, Bendshadler organized and presented information during FPC seminars in the state of Oregon during the conspiracy.

In 2001, Richard Fuselier ("Fuselier") founded Compensation Consultants, Inc. ("CC"), in Lafayette, Louisiana.  CC was formerly known as "Tax Protestor Services, Inc."  Fuselier used CC to design and market abusive tax products to assist people evade assessment or collection of federal income taxes.  Fuselier designed the Claim of Right program, described below and founded the Common Law Court and the Common Law College to market books, courses and other materials to use to train common law litigators and to seek access to federal courts.

Defendant Richard Ortt ("Ortt") was Fuselier's partner in CC and assisted in marketing and selling the Claim of Right program.  From February 2002 through March 2004, Ortt also prepared income tax returns for taxpayer-clients that incorporated the Claim of Right.

The Claim of Right, referred to interchangeably as the 1040X or Claim of Right Tax Freedom Program, was a program wherein defendants and others assisted tax payers, for a fee, prepare and file with the IRS, tax returns claiming false itemized deductions equal to the amount of wages or self-employment income earned.  The intent was to eliminate all tax liabilities on such income. In turn, the tax returns filed under this program requested from the IRS a refund equal to the amount of Federal income, Social Security and Medicare taxes withheld from wages.

In 2002, defendants Saladino, Ortt and Fuselier met in Louisiana to discuss the possibility of FPC marketing and selling the Claim of Right program.  Following that meeting, Saladino and Fuselier agreed that FPC would market and sell the Claim of Right Program, that Fuselier would review FPC's claims and in exchange, Saladino would create a website for CC.  Saladino worked directly with Fuselier and maintained conduct regularly through telephone and email regarding the Claim of Right. They often discussed changes before incorporating them in the marketing and implementation of the Claim of Right program.  Saladino made regular payments to Fuselier from 2002 through May 2003 for Fuselier's services and expenses.

As the Claim of Right was rejected by the IRS, Saladino and Fuselier coordinated their efforts to file lawsuits against the United States in federal courts on behalf of their customers in an effort to delay the collection efforts of the IRS.  CC provided FPC with pleadings and forms to implement the Claim of Right program.  Fuselier agreed to and did train and assist FPC's litigators defend the Claim of Right program, and FPC paid CC for these efforts.

The defendants charged tax payers for the abusive tax products.  For example, FPC charged $1,095 for the first tax year and $250 for each additional tax year for which a return was prepared utilizing the Claim of Right program. In addition, FPC received 25% of the amount any

refunds received as a result of the Claim of Right tax returns in excess of $1,000. CC offered several price options to its customers, including a flat fee or one based on the amount of refund the tax payer received. Other products sold by defendants through FPC and described below, had various prices. From 2002 through March 2004, FPC collected in excess of $629,000 from clients who purchased or utilized the Claim of Right Program. The marketing and sale of the Claim of Right by defendants eventually resulted in over 1,000 tax returns filed in 43 states and one Canadian province. The IRS conservatively estimates its loss in excess of $9 million.

In marketing the Claim of Right and other programs to tax payers during the conspiracy, defendants misrepresented the efficacy of the products. For example, the government will introduce testimony that defendant Bendshadler represented that the Claim of Right program was "bullet-proof," defendant Saladino represented that FPC and CC were having success with the IRS and the courts, and defendant Ortt led customers to believe that the Claim of Right program was legal with no risks involved.

Defendants' claims were not accurate. Both CC and FPC required their customers to sign Powers of Attorneys that were submitted to the IRS with the Claim of Right, ensuring that they received copies of all notices to the tax payer from the IRS. Throughout the course of the conspiracy, the defendants received voluminous notifications that the Claim of Right and the other abusive tax products they were selling were not "bullet-proof," but instead improper, unsound and not based in law or fact. For example, defendants received frivolous filing and disallowance letters from the IRS. Through these documents, defendants were informed that their customers were not only being denied their "claim of right" they were also being assessed fines and penalties as a result. While some of the defendants' customers received refunds,

eventually these customers too were assessed fines and penalties, in addition to returning the refund as a result of their filing.

In response to these notices and as part of the conspiracy, defendants filed frivolous claims against the United States in the Court of Federal Claims on behalf of the taxpayers. The defendants were not successful in court. During the course of the conspiracy, the defendants received and/or became aware of numerous court opinions and other legal documents rejecting out of hand the Claim of Right and other abusive tax programs. For example, in *Ledford v. United States,* 297 F.3d 1378 (Fed. Cr. 2002), one of CC's clients who used the Claim of Right, Mr. Ledford, "in an effort to halt the collection proceedings and the investigation of his failure to pay any income tax, * * * filed a complaint in the Court of Federal Claims seeking habeas corpus relief, injunctive and declaratory relief, money damages and the refund of federal taxes for 1996, 1997 and 1998." *Id.* at 1380. In upholding a dismissal based on jurisdictional grounds the court examined the merit underlying the Claim of Right program and noted the following:

> * * * Mr. Ledford bases his entitlement to this relief on his view that the federal tax code does not tax compensation received for personal labor. Mr. Ledford's view of the tax law is mistaken, as the tax code quite plainly defines income to include amounts received in compensation for services rendered. 26 U.S.C. § 61(a) (2000). * * * **Indeed, every court that has considered the matter has found this argument to be wholly without merit-so much so that merely raising it is considered sanctionable.** *E.g., Casper v. Comm'r*, 805 F.2d 902, 906 (10th Cir.1986) ("Merely raising the argument that value received for labor does not constitute taxable income, but rather constitutes a nontaxable exchange of property, justifies the imposition of sanctions."); *Connor v. Comm'r*, 770 F.2d 17, 20 (2d Cir.1985) (per curiam) ("Wages are income. The argument that they are not has been rejected so frequently that the very raising of it justifies the imposition of sanctions." (internal citation omitted)); *Lovell v. United States*, 755 F.2d 517, 519-20 (7th Cir.1984) (per curiam); *see also United States v. Connor*, 898 F.2d 942, 943-44 (3d Cir.1990) (noting that "[e]very court which has ever considered the issue has unequivocally rejected the argument that wages are not income," and collecting cases).

*Id.* at 1381-82 (emphasis added).  Defendants Saladino and Ortt reviewed and/or were aware of the court's decision in *Ledford*, yet continued to market and sell abusive tax products based on the same theory discredited in court cases such as *Ledford,* and others.

In addition, the Department of Justice Tax Division pursued and obtained preliminary and final injunctions in March 2004 and January 2005 respectively. The preliminary and final injunctions barred Saladino, FPC, and any agent of FPC from organizing, promoting, marketing, or selling any abusive tax shelter, plan or arrangement that advises or encourages taxpayers to attempt to violate the internal revenue laws or unlawfully evade the assessment or collection of their federal tax liabilities.  On March 4, 2004, the IRS executed a search warrant on Saladino's home and the FPC offices.  Despite this, the defendants continued to market abusive tax products and defendants Bendshadler, Mungovan and Saladino, through the end of 2005.

Saladino changed or discontinued programs as they were stopped by the IRS or determined to be ineffective. A brief summary of the other programs sold by defendants Bendshadler, Saladino and Mungovan since 2001 follows:

1.     Expatriation/Repatriation- The Expatriation/Repatriation program was sold through FPC
       as early as the year 2001 and was discontinued sometime in Spring of 2002. The program
       was marketed as a way for FPC's clients to renounce "Corporate" United States
       citizenship while retaining some type of "American" citizenship. Under the program, FPC
       would prepare a document on the client's behalf that the client would then mail to the
       IRS, the President of the United States, and other parties notifying the government that
       the individual was no longer subject to Federal jurisdiction. FPC sold the
       Expatriation/Repatriation program mainly based on the represented benefit that the client

would no longer be under the jurisdiction of the IRS and therefore not liable for income

tax. FPC sold the Expatriation/Repatriation program for $1,095.

2.     Corporation Sole--FPC began offering this program in early 2002 as a way for FPC's

clients to form their own "church" and therefore excepted from the requirement to file tax

returns or pay income taxes. For $2,295, FPC would set-up and provide documentation

for a Corporation Sole. The name of this program was changed to the Church

Organization Assistance Program in 2005, after the issuance of the final civil injunction

which banned any agent of FPC from selling the Corporation Sole.

3.     Limited Liability Company - This program was sold beginning 2003 in conjunction with

the Corporation Sole and purportedly enabled FPC's clients to form an LLC to pass

through all income to the Corporation Sole, thereby eliminating income taxes on the

business. FPC assisted in setting up an LLC for its clients for $2,295.

4.     Individual Master File (IMF) - This program was sold in conjunction with the Claim of

Right program. FPC would request a copy of the client's Individual Master File from the

IRS and "decode" the file for the client to reflect that the client was not required to file tax

returns.

5.     Affidavit/Statement - This program was the successor to the Claim of Right program and

was first offered through FPC after the final injunction in early 2005. Under this program,

FPC prepared a lengthy affidavit or statement on behalf of the client in an effort to satisfy

the requirement to file a "return or statement" as required under Title 26 U.S.C. § 6011

(a)I. The Affidavit/Statement is an approximately 60 page document that includes

arguments that have long been associated with the tax protest movement including:

- Arguments questioning the identity of the Secretary of the Treasury
- Affiant is not a "citizen of the United States"
- Affiant is not a "resident of the United States"
- Affiant did not have any "gross income" or "taxable income"
- Affiant is not subject to the Internal Revenue Code (IRC)
- Affiant is not a "taxpayer" as defined in the IRC
- Affiant is not "liable" for income taxes
- Affiant is not subject to the jurisdiction of the IRC
- Affiant does not live in a "Federal Zone"
- The IRS is acting without proper "Delegation of Authority" from the Secretary of the Treasury ,
- IRS is Not an Agency Created by Act of Congress
- The Commissioner of the IRS is only authorized to administer the tax laws in the Panama Canal Zone, Puerto Rico and the Virgin Islands
- Affiant is not a "United States person"
- Affiant is a "nonresident alien" and therefore not subject to the Federal Income Tax
- Affiant is "not for profit" under Title 25 USC § 183(a) and (e)(3)
- Affiant is not a "slave" or subject to "involuntary servitude" as explained in the 13th Amendment to the Constitution
- Affiant is exempt from Federal and State Withholding

The Affidavit/Statement was then mailed to Treasury Secretary John Snow in order for Secretary Snow to "assist" each client in determining if there was a requirement for that tax payer to file a tax return or pay taxes. The Affidavit/Statement gave the Secretary 21 days from the mailing of the document to respond or the arguments would be construed to be accepted by the Secretary and the Affiant no longer required to file returns or pay taxes and is entitled a return of all property, taxes, penalties and interest paid for the year covered by the Affidavit/Statement. The pricing structure for the Affidavit/Statement program is the same as the Claim of Right program.

/ / /

/ / /

/ / /

## VII.    ELEMENTS OF THE OFFENSES

The defendants are charged with a *Klein* conspiracy[1] under 18 U.S.C. § 371.[2]  In order to convict defendants the United States must show: (1) defendants entered into an agreement; (2) to obstruct a lawful function of the government; (3) by deceitful or dishonest means; and (4) one of the defendants performed at least one overt act in furtherance of the conspiracy.  *United States v. Caldwell,* 989 F.2d 1056, 1059 (9th Cir. 1993).

### a.    Agreement

The essence of the crime of conspiracy is the agreement.  For a conspiracy conviction, "the prosecution need not show the agreement to have been explicit. An implicit agreement may be inferred from the facts and circumstances of the case."  *United States v. Boone*, 951 F.2d 1526, 1543 (9th Cir. 1991)(citations and quotations omitted).  Indeed, as recognized by the Third Circuit, "common sense suggests, and experience confirms, that illegal agreements are rarely, if ever, reduced to writing or verbalized with the precision that is characteristic of a written contract. Rather, the illegal agreement can be, and almost always is, an implicit agreement among the parties to the conspiracy."  *United States v. McKee*, 506 F.3d 225, 238 (3rd Cir. 2007).

To demonstrate that each defendant participated in and was a member of the conspiracy, the government must prove that each of the defendants knew of the conspiracy and intended to join it with the purpose of accomplishing the object of the conspiracy.  "A participant in the

---

[1]So named after *United States v. Klein,* 247 F.2d 908 (2d Cir. 1957).

[2]The applicable section of 18 U.S.C. §371 states:
> If two or more persons conspire * * * to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

conspiracy need know only the essential nature of the plan and [his] connections with it, without requiring evidence of knowledge of all its details or of the participation of others." *Bluementhal v. United States,* 332 U.S. 539, 557 (1947). Once the existence of a conspiracy is established, evidence which demonstrates beyond a reasonable doubt that a defendant is even slightly connected with the conspiracy is sufficient to convict him of knowing participation in the conspiracy. *Boone*, 951 F.2d at 1543. "A defendant may be 'slightly connected' even if he did not know all the conspirators, did not know all the details of the conspiracy, did not participate in the conspiracy from the outset, and did not participate in all the enterprises of the conspiracy." *United States v. Corona-Verbera*, 509 F.3d 1105, 1117 (9th Cir. 2007).

The evidence will establish that during 2001 and 2002 the defendants, Bendshadler, Saladino and Mungovan (beginning in 2002) were selling abusive tax products including the Expatriation Program and the Corporation Sole to tax payers on behalf of FPC. In 2002, defendants Ortt, Saladino and Fuselier met in New Orleans and discussed, among other things, the possibility of FPC marketing and selling the Claim of Right Program. CC agreed to provide information about the Claim of Right as well as assistance in litigation and, in exchange, Saladino agreed to assist CC with a website, a promise Saladino failed to delivered on. During the meeting, Saladino informed Ortt and Fuselier about the products FPC was offering. Following the meeting, all of the defendants marketed and sold abusive tax products, including the Claim of Right and CC directed and assisted FPC in implementing the Claim of Right to FPC customers throughout the course of the conspiracy.

/ / /

/ / /

Page 11 - **GOVERNMENT'S TRIAL BRIEF**

**b.      To obstruct a lawful function of the government**

Under 18 U.S.C. §371, the government must prove that the defendants intended to obstruct a lawful function of the government.  In this case, the Indictment alleges that defendants intended to impede, impair, obstruct and defeat the lawful government functions of the Internal Revenue Service, an agency of the United States,[3] in the ascertainment, computation, assessment and collection of revenue, that is, federal individual income taxes.  Indictment, ¶18.  The government will introduce ample evidence to support the conclusion that the defendants intended to impede, impair or obstruct the IRS in its lawful function of the collection of taxes.  The defendants' intent will be shown by the following evidence: (1) the defendants lied to individuals about their success with the IRS and the courts in an attempt to convince tax payers that the abusive tax products would work; (2) the defendants charged tax payers for the services, including a percentage of any return the tax payer received as a result of the abusive tax product; (3) the defendants continuously altered the Claim of Right throughout the course of the conspiracy and used other abusive tax products to assist tax payers evade their tax obligations as the IRS denied tax refunds and assessed penalties; (4) the defendants were notified by outside qualified professionals, including lawyers and accountants, that their products were not legal, yet they continued their actions in submitting false tax returns and marketing and selling abusive tax products; (5) the defendants were notified by legal authorities, including the IRS, state revenue departments, the Department of Justice and courts that their tax products were improper and not based in law; (6) with one exception in a single tax year, the defendants did not use these

---

[3]This court has taken judicial notice that the Internal Revenue Service is an agency of the United States.  Docket No. 156.

products in preparation of their own personal tax returns despite their claims that such products were valid; (7) the defendants continued to submit tax returns or other documents to the IRS or Department of Treasury with the discredited theories and deductions; and (8) the defendants continued to file lawsuits and other court filings litigating claims related to these abusive tax products despite court cases indicating the claims had no merit.  As the First and Eighth Circuits have noted, "while [v]olumes could be written * * * a more compact solution is at hand: where the conspirators have effectively agreed to falsify IRS documents * * * the fact finder may infer a purpose to defraud the government by interfering with IRS functions." *United States v. Goldberg.* 105 F.3d 770, 774 (1st Cir. 1997); *United States v. Ervasti*, 201 F.3d 1029, 1037 (8th Cir. 2000). This is such a case.

### c.    By deceitful or dishonest means.

The government must show that defendants obstructed the operations of the IRS by "deceit, craft or trickery, or at least by means that are dishonest." *Caldwell,* 989 F.2d at 1058; *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924).  Neither the conspiracy's goal nor the means used to achieve it need to be independently illegal.  *Caldwell,* 989 F.2d at 1058. The defendants used deceitful and/or dishonest means in their quest to obstruct the United States government.  The defendants deceit is twofold: (1) defendants submitted false documents to the IRS, the Department of Treasury and the courts; and (2) the defendants were not honest with tax payers in order to induce them to purchase these abusive tax products.  First, the defendants' filed false documents with the IRS and the Department of Treasury asserting in essence that income was not taxable despite overwhelming notice that the theories were incorrect.  Moreover, despite notice from the IRS, the Department of Treasury, the Department of Justice and

eventually the courts themselves, the defendants filed frivolous claims in the federal courts on behalf of their customers seeking damages for the same basis and in an effort to delay enforcement actions by the IRS. Second, the defendants actively misrepresented their success in using these products to tax payers in an effort to tax payers to purchase defendants' products. This resulted in false returns being filed with the IRS and additional frivolous claims being asserted in federal courts.

### d.    At least one overt act in furtherance of the conspiracy performed.

An overt act is done by a member of the conspiracy for the purpose of carrying out or accomplishing the object of the conspiracy. Because the purpose of the overt act is merely to show that the conspiracy is at work, the overt act need not be criminal in character. *United States v. Touhey,* 867 F.2d 534, 537 (9th Cir. 1989). The government need not prove all of the overt acts in the Indictment, one is sufficient. Moreover, the government is not required to disclose during pre-trial discovery all of the overt acts it intends to establish at trial. *Cook v. United States,* 354 F.2d 529, 531 (9th Cir. 1965). In this case, the government has alleged 89 overt acts and will introduce the evidence above to demonstrate that at least one defendant engaged in many overt acts for the purpose of carrying out the object of the conspiracy.

## VIII.   ANTICIPATED DEFENSES

### a.    Good Faith

Defendant Saladino has indicated he will introduce expert witness testimony that he has a narcissistic personality disorder in order to "negate criminal intent and affirm[] defendant's good faith belief that he was complying with the tax laws, not conspiring to defraud the United States by deceitful and dishonest means." Docket No. 206. While a defendant may, in some instances,

introduce evidence that he or she did not intend to defraud the government because they

subjectively believed that they were complying with the law, mere disagreement with the law,

does not constitute good faith misunderstanding.  *United States v. Powell,* 955 F.2d 1206, 1212

(9th Cir. 1992).  In this case, the evidence will demonstrate that the defendants did not, indeed,

could not, subjectively believe that they were complying with the law.  Instead, the evidence will

demonstrate that the defendants fundamentally disagreed with the proprietary of the IRS

collecting taxes on any income, regardless of the law.

      **b.**     **Multiple Conspiracies**

The government anticipates that defendants, and in particular Ortt and Bendshadler will

contend that they were not part of the conspiracy charged in the indictment.  To establish the

existence of a single conspiracy, as compared to multiple conspiracies, the basic "test is whether

there was 'one overall agreement' to perform various functions to achieve the objectives of the

conspiracy." *United States v. Zemek*, 634 F.2d 1159, 1167 (9th Cir.1980), *cert. denied*, 452 U.S.

905 and 450 U.S. 916 (1981).  Moreover, the "general test also comprehends the existence of

subgroups or subagreements." *Zemek*, 634 F.2d at 1167. "The evidence need not be such that it

excludes every hypothesis but that of a single conspiracy; rather it is enough that the evidence

adequately support a finding that a single conspiracy exists."  *United States v. Kenny*, 645 F.2d

1323, 1335 (9th Cir.), *cert. denied*, 452 U.S. 920 (1981).

To determine whether the evidence supports the existence of one overall criminal

venture, relevant areas of inquiry include "the nature of the scheme; the identity of the

participants; the quality, frequency, and duration of each conspirator's transactions; and the

commonality of times and goals." *Zemek*, 634 F.2d at 1168; see, e.g., *United States v. Baxter*,

492 F.2d 150, 158 (9th Cir.1973), *cert. denied*, 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292

(1974) (jury may find one overall scheme if each defendant "knew or had reason to know, that

other retailers were involved ... in a broad project for the smuggling, distribution and retail sale

of narcotics, and had reason to believe that their own benefits derived from the operation were

probably dependent upon the success of the entire venture ...."). In this case, the evidence

presented at trial will demonstrate that all of the defendants were involved in similar, if not

identical acts aimed at impeding the lawful functions of the IRS. In this case, the defendants'

goals were all consistent: to sell products to individuals to aid them in evading taxes. The

evidence will further show that defendants coordinated their efforts in this regard using the same

theories, the same pleadings and the same mechanisms. The evidence presented at trial will

demonstrate that the defendants all had a common purpose in their action. In short, the evidence

will show the defendants were engaged in one conspiracy–the one charged in the Indictment.

 At this time, the government knows of no other defenses defendants intend to raise at

trial.

## IX.   EVIDENTIARY ISSUES

###   a.   Summaries

 As outlined in its Exhibit List, the government intends to introduce summaries of

voluminous evidence pursuant to Fed. R. Evid. 1006 so that the jury can comprehend such

evidence. Consistent with Fed. R. Evid. 1006, the government will identify to defense counsel

the duplicates of the underlying data that it has already provided to defense counsel.

 In addition, the government will introduce summaries of evidence that will be admitted

into evidence. These summaries will relate to documents in evidence, and such a chart or

summary is properly admissible under Fed. R. Evid. 611(a). *See United States v. Olano*, 62 F.3d 1180, 1204 (9th Cir. 1995); *United States v. Gardner*, 611 F.2d 770, 776 (9th Cir. 1980). Summary charts admitted under Rule 611(a) may be used as a testimonial aid for witnesses and for reference by counsel during argument, but they are not admitted into evidence or used by the jury during deliberations. *See United States v. Wood*, 943 F.2d 1048, 1053 (9th Cir. 1991). The facts summarized in the charts must be supported by evidence. *See United States v. Soulard*, 730 F.2d 1292, 1300 (9th Cir. 1984).

      **b.**     **Expert Testimony**

      At trial, the government will call IRS revenue agent, Kristin Emminger. Ms. Emminger is a 22 year employee of the IRS and her testimony will demonstrate the scope of the defendants' conspiracy by offering evidence of the number of tax returns filed under the Claim of Right Program, the tax loss sustained by the IRS as a result of this abusive tax product, the evolving nature of the Claim of Right Program that defendants sold to tax payers and in turn, submitted to the IRS and how the abusive tax products and arguments submitted by defendants are similar in nature to those presented to the IRS by others who disagree with the propriety of the IRS in collecting any taxes on income. Moreover, the Ms. Emminger will testify about the IRS' experiences with these claims in the past and why the IRS treated the defendants' product in the manner that they did.

      The government will also call IRS Court Witness Coordinator Deb Barham. Ms. Barham has been employed with the IRS for over 20 years in a variety of positions. She will testify about the IRS processing of returns, including how frivolous filing letters and notice of disallowances are generated. She will testify about how the IRS processed the documents defendants

submitted, including the Power of Attorney that defendants required their customers to sign, the 1040X, the Claim of Right Program and other exhibits.  Moreover, Ms. Barham will introduce official IRS records indicating that the defendants failed to file tax returns.  The government anticipates that Ms. Barham's testimony is that of a fact witness rather than an expert witness.

Defendant Saladino has identified Dr. Norton Roitman as an expert witness that he plans to call at trial to "negate criminal intent and affirm[] defendant's good faith belief that he was complying with the tax laws, not conspiring to defraud the United States by deceitful and dishonest means."  Docket No. 206.

If Dr. Roitman testifies, the government may call Dr. Daniel Hayes in its rebuttal.  Dr. Hayes is a psychologist who examined Saladino on September 28, 2009 pursuant to this court's order.  Dr. Hayes conducted a comprehensive examination of the defendant and his final report is expected shortly.

No other defendant has identified any expert that they plan to call at trial, nor have they provided any discovery to the government.

    **c.**    **Motions in Limine**

The government has filed three motions in limine: (1) to exclude defendants from offering their own inadmissible self-serving hearsay statements; (2) to exclude testimony by defendant Saladino's expert that would violate Fed. R. Evid. 704(b); and (3) to exclude legal and psuedo-legal documents and testimony from defendants until they lay the proper foundation for the introduction of such evidence.  The motions are pending with the court and are expected to be decided during the pre-trial conference on October 23, 2009.

/ / /

**d.    Jury Instructions**

The government will seek to have the court instruct the jury that the legal theories underlying the Claim of Right program and other abusive tax products sold by defendants were not valid.  Such instruction is consistent with Ninth Circuit case law.  *United States v. Powell,* 955 F.2d 1206, 1212 (9th Cir. 1992); *United States v. Romero,* 640 F.2d 1014 (9th Cir. 1981).

## X.    CONCLUSION

The government submits that the evidence will support the charges against the defendants beyond a reasonable doubt.

DATED this 13th day of October, 2009.

> Respectfully submitted,
> KENT S. ROBINSON
> Acting United States Attorney
>
>
> */s/ Michelle Holman Kerin*
> ALLAN M. GARTEN
> Assistant United States Attorney
> MICHELLE HOLMAN KERIN
> Special Assistant United States Attorney